886 So.2d 572 (2004)
Edward Charles WASHINGTON and Travis Parker
v.
AETNA LIFE INSURANCE COMPANY, d/b/a One Canal Place, Otis Elevator Company, ABC Insurance Company, The Unknown Insurer of Otis Elevator Company, Schindler Elevator Corporation (and/or Schindler Haughton Elevator Corporation), et al.
Edward Charles Washington
v.
Zurich American Insurance Company, Professional Employer Services, Inc. and The State of Louisiana.
Nos. 2004-CA-0135, 2004-CA-0136.
Court of Appeal of Louisiana, Fourth Circuit.
October 13, 2004.
*574 Tom W. Thornhill, Chadwick W. Collings, Angela White-Bazile, Thornhill Law Firm, L.C., Slidell, LA, for Plaintiff/Appellee, Edward C. Washington.
James R. Strain, Jr., Slidell, LA, for Plaintiff/Appellee, Travis Parker.
James T. Ferrini, Ann C. Chalstrom, Clausen Miller, P.C., Chicago, IL, and Thomas G. Milazzo, Miranda, Warwick, Milazzo, Giordano & Hebbler, Metairie, LA, for Defendants/Appellants Aetna Life Ins. Co., d/b/a One Canal Place, and Corporate Realty, Inc.
Christopher J. Aubert, Tracy E. Gold, Aubert Law Firm, L.L.C., Covington, LA, for Defendants/Appellants Schindler Elevator Corp. and Zurich American Ins. Co.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge DENNIS R. BAGNERIS SR. and Judge DAVID S. GORBATY).
*575 JOAN BERNARD ARMSTRONG, Chief Judge.
The defendants in this personal injury case, Aetna Life Insurance Company, d/b/a One Canal Place (Aetna), Corporate Realty, Inc. (Corporate), Schindler Elevator Corporation (Schindler) and Zurich American Insurance Company (Zurich) appeal from a judgment rendered on jury interrogatories and verdict finding the defendants liable to the plaintiffs, Edward Charles Washington and Travis Parker, for damages sustained by the plaintiffs when a Schindler elevator operating in One Canal Place malfunctioned. The jury found Corporate and its insurer, Aetna, liable for one-half and Schindler and its insurer, Zurich, liable for one-half of the total damages. It awarded Mr. Washington $200,000 for disability and/or disfigurement; $200,000 for loss of enjoyment of life; $1,000,000 for past physical and mental pain and suffering; $62,000 for lost wages; $42,000 for lost earning capacity; and $150,000 for past and future medical expenses. The jury awarded Mr. Parker $207,800 for past physical and mental pain and suffering; $6,000 for lost wages and $6,000 for past and future medical expenses. For the reasons that follow, we amend the judgment of the trial court to delete the award to Mr. Washington of $200,000 for loss of enjoyment of life and of $200,000 for disability and/or disfigurement, and as amended, affirm the judgment of the trial court.
The action arises from an elevator incident that allegedly occurred on June 8, 2000, when Mr. Washington and Mr. Parker claim the freight elevator in which they were riding violently stopped, fell and rose, causing the injuries of which they now complain.
Mr. Washington testified at trial that in June of 2000 he was employed by AWD as a countertop and laminate worker and also worked as a horse trainer and had a start-up carriage service in Slidell, Louisiana. Prior to his promotion to the laminate department, Mr. Washington had worked as a truck driver for AWD, and had made regular deliveries to One Canal Place for about three months. On June 8, 2000, he clocked in with AWD to work in the laminate department. At 10 or 11 o'clock he was asked to drive the AWD truck to Canal Place, and did so after lunch to make a delivery with Mr. Parker. When they arrived at One Canal Place, he and Mr. Parker off-loaded their cargo and learned that an elevator had been down for repairs and had been back in service for the last forty-five minutes to an hour. He testified that he had had prior experiences in which this elevator malfunctioned by skipping floors, stopping at inappropriate times, and allowing air to gush through it.
On the day of the accident, he and Mr. Parker entered the elevator with two other deliverymen. Mr. Washington and Mr. Parker made a delivery to the 15th floor and returned three times. On the third trip down, Mr. Washington pushed the button on the 15th floor and got into the elevator with the other two delivery men and Mr. Parker. As they proceeded down, the elevator stopped for no reason on the 8th floor. It started again, and Mr. Washington leaned over, resting on the cart. At the 4th or 5th floor, the elevator gave a little jerk and descended faster, coming to a hard stop. When it hit, Mr. Washington felt his knees go out and fell back, dazed. He did not know if he hit the floor. After that, the elevator started to work properly, and the men got off in the basement. Mr. Washington sat down, shaken, scared and trying to get himself together. About fifteen minutes later, he went to the truck, told Mr. Parker he was hurt, called his office and told them what had happened.
*576 Mr. Parker testified at trial that he had been an ADW employee for about a year prior to the accident, and had progressed from a mill helper to cabinetmaker. Prior to the accident, he made approximately four deliveries with Mr. Washington to One Canal Place. His testimony confirmed Mr. Washington's concerning the elevator accident, but was not specific as to where the elevator began to accelerate. He testified that after the accident, he was sore and in a state of shock. He had pain in his back, knees and upper neck.
Schindler and Zurich, and Corporate and Aetna contend in their first assignments of error that the trial court abused its discretion when it excluded videotape evidence.
The defendants take the position that the incident on the elevator was not as serious as described by the plaintiffs, and sought to introduce a purported surveillance tape of the incident in support of their position. The tape was the object of a three-day pre-trial hearing, at which five hundred thirty-seven pages of testimony were taken before the trial court. Trial counsel contested the admissibility of the videotape energetically, and eleven witnesses, including the two plaintiffs, gave testimony.

Testimony of Charles H. Peterson
Charles H. Peterson, executive president and general manager of One Canal Place for Corporate, the building's manager, testified that he is in charge of the operations of the Canal Place office building, including record keeping and security. He identified the incident report dated June 14, 2000 and faxed to him by W.S. Bellows Construction Company[1] on June 19, 2000 describing the elevator incident and including statements by Mr. Washington and Mr. Parker.
Mr. Washington gave the following statement typed on AWD letterhead:
Travis Parker and myself were making a delivery to Phelps-Dunbar at Canal Place on the 15th floor. We had picked up doors and were on our way to the basement, there were two other fellows in the elevator with us. The elevator [sic] I was standing in the center of the elevator, when it seemed to skip some floors. The elevator made a dead stop, my knees bent and I almost went to the floor. We unloaded the doors onto our truck, I called the office to tell them what had happened then got into our truck and returned to the plant. My knee was in pain. And later that evening I went to the hospital to have it looked at.
Mr. Parker gave the following statement typed on AWD letterhead:
Ed Washington and I were riding in an elevator at Canal Place on June 8, 2000 with two other men, one man's name was Travis the other I do not remember. We were coming down from the 15th floor on our way to the basement. Ed was half standing on one of the carts and I was leaning on one. The other men were just standing next to their carts with full loads.
The elevator was not the [sic] full but not enough room to move around because of the carts. When we got to the 5th floor (still going down), it felt like the elevator sped up then made a complete (hard stop) stop on the 1st floor and we did not even want to got o[sic] the 1st floor, we pressed B for *577 basement. Anyway, when it stopped it almost put me on the floor, same with the others I was with. After it stopped on the 1st floor you could tell Ed was hurt. The other two men just got the [expletive in original has been deleted] scared out of them. When it stopped at the 1st floor the doors didn't open and the elevator went back up a floor the back [sic] down to the basement. The whole day Ed and me [sic] were saying the elevator didn't sound very well so did a whole lot of other people.
That elevator could have hurt someone worse if we would have had the doors standing up. The only thing it did to me is scare me and almost put me on the ground. This problem needs to get resolved with Phelps and the Canal Street building. This elevator is used every day is [sic] not very good quality or safe for employees that are sent to Phelps.
I know I will probably not get in that elevator again.
When Mr. Peterson received the fax, he requested the surveillance videotape for the day of the incident. He testified that Benjamin P. Poche, project engineer, brought the tape to his office within ten to fifteen minutes. Mr. Peterson put the tape into the video player located in his office's break room and viewed the tape. At the hearing, the tape was played briefly and Mr. Peterson identified the four views shown on the tape: the top two views are of the lobby, the bottom left shows the inside of the service elevator, and the bottom right view is the basement vestibule for the service elevator. He testified that after he viewed the tape in the break room at his office, he put it into his file cabinet for storage where it remained until it was requested by Tracey Tarleton of Corporate's legal department in September of 2001. Corporate's intracompany delivery service took the tape to Ms. Tarleton's office in Kenner, Louisiana[2]. On cross-examination, Mr. Peterson admitted that access to his file cabinet was available to Corporate employees, and the cabinet was not locked.
Mr. Peterson testified that while the tape was in his possession, he did not show it to anyone else, copy it, perform any tests on it, destroy or edit it or have anyone attempt to edit it. He admitted on cross-examination that he was unable to account for the security of the tape, and merely knew where the tape was supposed to be kept. The "original" tape will be referred to in this opinion as the tape offered by the defense.[3]
On cross-examination, Mr. Peterson testified that the tape had been in the Canal Place video room from June 8, 2000 until he viewed it on June 19, 2000. Mr. Peterson and five or six engineers have access to the video room. He was unable to determine whether custodial employees and security personnel also had keys to the video room. He outlined the ways in which he contends the videotape is inconsistent with the statements given by Mr. Washington and Mr. Parker. Mr. Peterson did not see Mr. Washington's knees bend or see him fall; however, he admitted that he did not know Mr. Washington and could not identify him as one of the persons appearing on the tape. He also admitted *578 that he did not review the entire tape.
Mr. Peterson did not know the type of recorder used to make the original tape, when it was purchased or the kind of tape that was used in 2000. He testified that he did not watch the video monitors on June 8, and that he reviewed the tape again after June 19, 2000, but could not recall when. No one was present with him at any time that he reviewed the tape.
Mr. Peterson testified that Benjamin P. Poche, the building engineer, would be the most knowledgeable person concerning the process for setting the date and time for the recording device, but did not know who, in fact, set the device on June 8, 2000. He was unable to determine whether the machine automatically or manually changed the date to reflect the fact that the year 2000 was a leap year.

Testimony of Tracey Tarleton
Ms. Tarleton, a house counsel for Sizeler Real Estate Management Company, a Corporate affiliate, testified that she neither copied nor altered the tape while it was in her possession. After Lakeside Camera copied the tape, the tapes were placed in Sizeler's vault. Ms. Tarleton admitted on cross-examination that there was nothing that identified what was copied by Lakeside Camera as the tape offered by the defense. Her testimony was also contradictory in that she initially insisted that she received two tapes from Mr. Peterson and later suggested that perhaps it was only one tape.
Ms. Tarleton testified on cross-examination that between September 19, 2001, when the tape was delivered to her office, and October 4, 2001, the tape was in an unlocked file cabinet in her office.

Testimony of Benjamin Paul Poche
Mr. Poche, the assistant chief operation engineer for One Canal Place, testified that as "start-up engineer" he comes to work at about five o'clock in the morning, turns on his computer, logs in, turns on all his equipment, goes to the roof and takes his readings. He starts taking log readings, water meter readings and reads miscellaneous meters from the roof down to the basement, goes through the VCR room, changes out the video recorder tape and then checks more meters. He testified that the VCR readout panel, showing the time of day, is checked daily when the tape is changed. The date is checked weekly.
Mr. Poche identified the Engineering Log and Checklist for June 8, 2000. He testified that he made the notations bearing his initials and many of the other notations, and could not identify who may have changed numbers on several items not relevant to the instant case.
Mr. Poche testified that in June of 2000 the Canal Place surveillance system was composed of thirteen cameras, four of which were recorded on tape. The recording equipment is kept in the VCR room in the basement, which Mr. Poche described as a "secure room." The engineers hold keys to the VCR room. He described the taping system as having two rows of tapes, each row comprising a month's recordings. Thus, a tape typically remains in existence for sixty days before it is used again. Every now and then, after rewinding the tape, he will play it to verify that the recording system is operating correctly, although he could not recall having done so on June 8, 2000.
He testified that records indicate that he was on duty on June 8, 2000, and he believes that he changed the tape on that day, although he did not have a specific recollection of having done so.
He identified the VCR from the VCR room as the same one being used in the *579 courtroom. On cross-examination, he admitted that he was not aware of the fact that in April and May of 2000 another VCR was being used in the VCR room, and admitted further that someone could have taken the original recorder and made a tape for June 8, 2000 without his knowledge.
Mr. Poche identified the tape offered by the defense, and did not have specific recollection of having brought it to Mr. Peterson's office at the latter's request. He testified that if that were the case, he would have brought the tape immediately to the office and neither copied nor edited the tape.
On cross-examination, Mr. Poche testified that he did not routinely change the VCR's speed, but was able to do so and to set the VCR date. He denied that he routinely set the date, and could not recall if he made changes to the date and time in the VCR during 2000 or whether he made a change in date to accommodate the extra leap day in February. He admitted that no Corporate employee could confirm that the tape offered by the defense was, in fact, recorded on June 8, 2000, and that he has no knowledge as to whether or not the date and time had been checked. He admitted that the tapes are not "write protected", so that they can be re-used, and that at any time after it was recorded, someone could have put additional information or information from another day, on any tape. He testified that the tape in question was now write-protected, but did not know who write-protected it or when this was done.
He was shown Corporate documents beginning in January of 2000 through July 15, 2000 showing similar problems with the elevator during the time construction was going on in the building. He admitted that on any given date during that time, when there were problems with the elevator, a person could have entered "June 8, 2002" on the film mistakenly or intentionally. He agreed that no one really knows if the tape offered by the defense actually was the tape for June 8 and 9 of 2000.
On further cross-examination, Mr. Poche admitted he could not identify Mr. Washington on the tape.

Testimony of John Baker Potts, II
Mr. Potts, former majority owner of AWD Corporation, testified that the corporation was a manufacturer of architectural woodwork to custom architectural designs. On June 8, 2000, AWD was building architectural woodwork to go in the Phelps Dunbar law firm in One Canal Place. Mr. Washington and Mr. Parker were part of the AWD delivery personnel. Mr. Potts viewed the videotape in the presence of the trial judge and counsel, and identified the objects in the elevator as McCray doors that were planned for outside the Phelps Dunbar boardroom. He testified that he could recognize the doors because he had built them, was intimately involved with the job, estimated and prepared all production tickets for the job. Mr. Potts testified that on June 8, 2000 Mr. Parker and Mr. Washington were the only AWD employees making deliveries to Canal Place. He identified two persons visible on the elevator in the videotape, one wearing a white shirt and dark baseball cap with a white bill and another wearing dark clothing with a white baseball cap and sunglasses on the bill. These persons were moving the doors and unloading them from the elevator at a time noted on the tape as 15:46:20. Both of the persons were touching a cart, which Mr. Potts recognized as an AWD cart he had designed in the 1980s. He identified the cart as a home design and testified that he had never seen it used by any other local subcontractor. AWD employees always used these AWD carts when making deliveries. *580 Mr. Potts identified the same cart and the same individuals at 15:06:01 on the tape and at 15:12:45 and at 15:13:40. At all three times, Mr. Potts identified his AWD cart and testified that the two individuals in the baseball caps were Mr. Washington and Mr. Parker.
On cross-examination, Mr. Potts testified that several AWD employees made deliveries to the Phelps Dunbar site at Canal Place. He described distinctive parts of the AWD cart that were visible in the videotape, and insisted that the AWD carts were unique and that he had never seen identical carts "anywhere in [his] life." He testified that other local contractors used more expensive "sheetrock dollies" but that he created the AWD carts to save money.
Mr. Potts first saw the videotape in November of 2002, two years and five months after the elevator incident. He was informed of the tape prior to that when the general contractor back-charged AWD approximately twenty-seven hundred dollars for damage by the AWD employees to the elevator. The general contractor sent Mr. Potts a copy of the videotape showing his employees were responsible for the damage. Mr. Potts accepted the charge, but did not view the tape at that time. He testified that he did not know if that video was a video of the incident that is the subject of this lawsuit, and testified that his office received the tape prior to June 8, 2000. This testimony indicates the videotape he received in connection with the $2700 back-charge did not relate to the incident in which the plaintiffs claim to have been injured. Mr. Potts testified that he does not know what became of the tape offered in connection with the pre-June 8, 2000 damage claim.
Mr. Potts admitted on cross-examination that Timmy Alexander, an African-American AWD employee, probably also made deliveries to Canal Place. When shown the videotape offered by the defense, Mr. Potts testified that he could identify Mr. Washington from the way he walks, carries himself, holds his cellular phone and wears his hat, but was unable to describe specifically these mannerisms. In deposition, Mr. Potts testified that he would bet his life on the fact that the individual on the videotape was Mr. Washington.
On further cross-examination, Mr. Potts admitted that Mr. Washington came to work for AWD on January 28, 2000, that he saw Mr. Washington off-site only once, at the post office, that Mr. Washington left AWD after his June 8, 2000 injury and that he did not see Mr. Washington again until he viewed the videotape offered by the defense in November of 2002.
Mr. Potts denied at trial being aware of Mr. Washington's workers' compensation claim; however, in his deposition testimony, he said he would not hire him again because "Mr. Washington having the claim with worker's comp on this incident would not make him a bright star."
Mr. Potts testified that he had no knowledge as to whether or not the time-and-date stamp on the tape offered by the defense was correct, and that the presence of other dates and times on the tape would call its validity into question. He also admitted that he was unable to see clearly the faces on the videotape and could not make a facial identification of Mr. Parker or of Mr. Washington from the tape.

Testimony of Terrell Andrew Miceli
Mr. Miceli, a private investigator, testified that he is a certified legal video specialist, a designation of the National Court Reporters Association reflecting additional training concerning preservation of evidence. The trial court accepted Mr. Miceli *581 as an expert legal video specialist and private investigator. In that connection, Mr. Miceli examined the surveillance equipment at One Canal Place and identified a Sony SVT-L200 video recorder and housing, and two rows of videotapes numbered 1 through 31A and 1 through 31B. He reviewed the original tape offered by the defense and its tape canister in the Milazzo office the day before his deposition was taken in April, but was not allowed to remove it from the office for authentication by testing. The tape was marked T120, but was not marked "Day 8." Mr. Miceli testified that upon his inspection of the facility and the tape depicted in the defense exhibit, the tapes were numbered Day 1A, Day 1B, and so forth. The offered tape was marked only as "Day 8" with no designation as to whether it was an A or B tape.
Mr. Miceli then identified tape 6A, showing two screens representing two camera angles and with a running time of seven minutes, and noted there was no counter on a particular frame, and that the date April 9 did not appear anywhere on the tape.; however, the date did appear on another copy of the same tape. Plaintiff Thornhill counsel wrote to defense counsel Aubert asking additional information, to which Mr. Aubert replied in pertinent part on August 14, 2002 as follows:
The tape is from the camera inside the elevator. The entire tape is many hours in length, and we carved out just the incident in question. If you wish to view the entire tape, it is certainly fine with me. Please let me know where you would like the original tape sent so that the whole tape can be copied and sent to you with the bill, and then returned to me. In this regard, the incident shown is, in fact, the incident in question. The people in the elevator are Mr. Washington and Mr. Parker, and the two presently unknown people who were talked about by Messrs. Washington and Parker in their depositions. I do not know their names, and I have no current prospects of finding out who they are.
On August 16, 2002, David Schexnaydre of the Aubert firm wrote to the Thornhill firm enclosing via Federal Express a 12-hour videotape "depicting the inside of the subject elevator on the date of the accident." Mr. Miceli testified that the Thornhill office told him that the videotape was not, in fact, enclosed in the Federal Express package. Counsel then played a videotape bearing number 11 that Mr. Thornhill stated he received the next day in a package from the Aubert office. Mr. Miceli testified that there was no information at the beginning of that tape indicating a date of April 9, 2000 or May 8, 2000. That tape ended at about 12:30 a.m. on April 9, 2000, and did not contain the majority of the material that was taped on June 9, 2000 from about 12:30 to about six in the morning. This tape was received by the Thornhill firm in response to its request to the Aubert firm for an unedited edition of the videotape in question.
Mr. Miceli was unable to identify Mr. Washington or Mr. Parker on either Tape Number 6 or Tape Number 11.
Mr. Miceli then identified a set of four tapes furnished by the defense on August 29, 2003. He also identified variations from the seven-minute tape (number 6) and tape 11. The set of four tapes ran past 12:30 on June 9 as opposed to the original tapes that ended at 12:30. The time on the four tapes was slowed down significantly as they played back.
Mr. Miceli testified that he was shown what was purported to be the unaltered original at the Milazzo office. He noticed that the numbering on the tape differed *582 from those he had seen in that it was not labeled as "Day 8" and did not contain the beginning of the tape. The pictures seemed to have been moved up and slightly enlarged in tape number 6. The speed or total running time of the tapes were also different. It was not until a tape was produced on August 29, 2003 that Mr. Miceli was shown a dated tape. Mr. Miceli opined that a tape could have been altered to manipulate the dates and times so that what was originally an April or May tape could have been made to appear as though it was actually made on June 8.
Mr. Miceli testified that he reviewed the evidence-handling procedure used at One Canal Place, and the testimony by Mr. Poche and Mr. Peterson as to how the tapes were numbered, and concluded that the videotape offered by the defense fails to meet the identifiable characteristics of those tapes that were used at the facility that he identified. Furthermore, he testified that the defense produced no evidence that anyone actually calibrated the videotape machine to the specific date and time in question. Therefore, it cannot be known if the tape from June 8 was actually made on June 8 or if perhaps this tape is from another date absent testimony that someone set the time and date and verified it upon removal of the tape from the machine.
Mr. Miceli also testified that his review of the surveillance facility revealed that there were no logs showing that the videotape was logged into any type of evidentiary database. There was no certificate of documentation showing the name of the video operator, persons handling the videotape and what it purported to show. Nor was documentation provided showing that the videotape was made by a particular person, what it showed and that it contained a specific date and time.
Mr. Miceli also testified that the videotapes were stored in a room that did not have controlled access. As testified to by Mr. Poche and Mr. Peterson, many persons were able to go in and out of the room, and Mr. Miceli observed that the videotapes were stored on a shelf that would have permitted access by unauthorized persons. Although the videotape machine itself was in a lockable cabinet, by admission the cabinet was never locked.
As to the handling of the tapes, Mr. Miceli observed that no one could identify himself as the person who retrieved it from the machine and without a doubt delivered it to Mr. Peterson. No one testified as to where the tape was placed after it was given to Mr. Peterson. In Mr. Miceli's opinion, the tape was passed around carelessly. Ms. Tarleton was unable to identify how many tapes there were, and the assumption in her testimony that the T160 tapes were copied onto a T120 tapes was incorrect since it is physically impossible to do so.
As to the absence of the April and May dates on some of the copied tapes, Mr. Miceli testified that had the tape been recorded properly, it would have contained everything present on the original tape. This was not the case. Human error, either inadvertent or intentional, caused the absence of the dates.
Mr. Miceli expressed the opinion that the tape offered by the defense could not be authenticated or identified. He observed that Mr. Poche testified that he used a 62-tape rotation, 1-A through 31A and 1B through 31B. Under that theory, the same tape could not have been used on April 8, May 9 and June 8 of the same year. Mr. Poche also testified in deposition and at trial that there were no changes to the VCR equipment installed at the facility, and that he would have been the person to have made such a change. *583 However, there was evidence that a different VCR was used to make the April/May recordings and the June recording. If the person who is to make the changes and recalibrate the machine did not recall having changed the VCR, the entire unit, Mr. Miceli was suspicious as to whether the reset date and time were correct.
Mr. Miceli testified that he used various methods to try to enhance the videotapes offered by the defense, and was unable to identify Mr. Washington or Mr. Parker in any of the tapes. In fact, it appeared to him that the African-American gentleman on the tape appeared to have an "Afro" haircut while Mr. Washington's photographs predating the incident show him with a very close-cropped hairstyle. He opined that, based on his observation, Mr. Washington and Mr. Parker are not shown on the defense videotape. Mr. Miceli testified:
There's nothing that I can see in the tapes, all the various tapes I've looked at, including the defense exhibit 3 [the tape offered by the defense], anything that indicates that Mr. Washington and Mr. Parker are the individuals depicted in the tape.
Mr. Miceli testified[4] that all the tapes he reviewed had been altered: some had been played back or recorded back at a slower speed, dates had been modified, tape number 6A had been modified or altered as compared with the tape offered by the defense; Tape number 11 had also been modified or altered, having missing dates and six or seven hours of missing information.
Mr. Miceli testified on cross-examination that in the course of his professional work he uses videotapes and VCRs on a daily basis. He identified the videotape offered by the defense as Maxell professional/industrial quality videotape, which records two hours and forty minutes in standard operating mode.
The first date stamp on the videotape is 4/9/00 6:40 a.m.; the next is 5/8/00 5:00 a.m.; the third stamp shows 6/8/2000 6 a.m. The lower quadrant of the tape shows at the end 6/9/2000 shortly after 6 a.m., followed by a second or so of static, and then 4/9/00 about 6:35 a.m., whereupon the tape ends. This result is caused by the VCR's "repeat record" feature, which provides that when the program reaches the end of the cycle, the machine rewinds the tape and starts recording over the previous recording. Mr. Miceli confirmed the testimony of building engineer Mr. Poche that this feature was in play on April 8, 2000 at 6 a.m. After 24 hours, the building engineer would replace the "Day 8" tape with a "Day 9" tape. Absent action by the engineer, the tape would continue to play for 24 hours, rewind, and record over the previous day's recording. Thus, a tape could have recorded at an earlier time at the end of the tape than at its beginning. Furthermore, because of the length of the tape and the fact that it moves at slightly different speeds all the time, one would never get to exactly the precise, specific moment on the tape time after time after time to record over earlier material. Because of the use of both dashes and slashes to separate the month, day and year on the videotape in question, Mr. Miceli opined that two different machines had been used to record on the tape, one of which could not use dashes.
Mr. Miceli testified that it is possible to alter the date and time on the tape using the machine in the courtroom by playing *584 the original tape and exporting it to a second recording system and rerunning it through the computer. The date and time could be changed, and then the tape would be exported back to another machine for recording. When asked if he had any facts that would tell him that this was done in this case to the tape offered by the defense, Mr. Miceli responded, "Well, I've seen so many variations of that tape, I believe that that has been done on numerous occasions." He admitted that he had not conducted any test of that particular original tape offered by the defense, although he had tested copies. In connection with the various tapes he had viewed, he testified that he did not see evidence that anyone was "morphed in", but noted that he could not authenticate the original tape, although the images were always consistent.
On further cross-examination, Mr. Miceli confirmed his opinions that the tape offered by the defense could not be authenticated because of the problems he had noted with the chain of custody, and that the individuals shown on the videotape could not be identified as the plaintiffs.

Testimony of Herman Miles, Jr.
Mr. Miles testified that he was an AWD maintenance and forklift operator who worked with Mr. Washington and Mr. Parker. At times he made deliveries, including deliveries of doors and cabinets, for AWD to One Canal Place. He had made such a delivery the day before the elevator incident and, at that time, the freight elevator "jogged" him. He did not fall down, but fell into the elevator doors. At the time, he was using carts supplied by AWD or whatever other carts were available. He also made deliveries at Canal Place with Mr. Brian Keith Morris and other Caucasian deliverymen employed by AWD. Other African-American AWD deliverymen included Robert Balancier and Timmy Alexander.
He viewed the videotape and testified that he thought the man with the cap could be Mr. Washington or could be Mr. Miles himself. In June of 2000 and at the time of the hearing, Mr. Miles wore a one and a half to two inch Afro hairstyle, similar to the one shown in the videotape. However, the taped figure appeared to have a bald spot, which Mr. Miles did not have. The clip showed someone who fell into the doors in much the same way Mr. Miles testified he had been "jogged" the day before the incident at issue in this lawsuit.

Testimony of Robert K. Hetrick
Mr. Hetrick testified that he knew Mr. Washington and was not able to identify him on the videotape. He did not find anything on the tape that would make him think Mr. Washington was depicted on the tape.

Testimony of Brian Keith Morris
Mr. Morris, a co-worker of the plaintiffs, was a truck driver who made deliveries to Canal Place in 2000 with Mr. Washington. He watched the tape and testified that he could not recognize either Mr. Washington or Mr. Parker. Neither could he identify the carts as AWD carts. He testified that the carts appeared to be carrying doors, but that while making deliveries to Canal Place he had seen people other than AWD employees using carts like those seen in the videotape. He testified that he rode the Canal Place elevator shown on the videotape and on numerous occasions the elevator would malfunction, becoming stuck between floors. On one occasion, the elevator fell or had a hard landing. He testified that he wore a ball cap when he made deliveries.

Testimony of Kim Charboneau
Ms. Charboneau testified that she worked for AWD in the shipping and receiving *585 department, and had worked with Mr. Washington and Mr. Parker for eight or nine months. She supervised deliveries to Canal Place and confirmed that AWD had several African-American employees who made those deliveries. She confirmed that Messrs. Washington, Miles and Balancier all wore ball caps from time to time. She was not familiar with Mr. Alexander's sartorial habits. She reviewed the tape and testified that none of the persons on the tape appeared to be Mr. Washington, and none looked more like Mr. Washington than they did any of the other AWD African-American employees. She also testified that companies other than AWD used carts similar to the cart shown on the tape. Furthermore, she was unable to identify the doors in the video as belonging to AWD.
Following the hearing at which the foregoing testimonial and documentary evidence was adduced, the trial court entered judgment excluding the videotape offered by the defense. In connection with the judgment, the court filed its reasons. Following an exhaustive discussion of the testimony, the court concluded that the tape was inadmissible for essentially two reasons: first, there was insufficient evidence to identify the persons on the videotape as Mr. Washington and Mr. Parker; second, issues concerning control and custody of the time made its authenticity highly questionable. The trial court noted that the only witness who identified the individuals on the tape as the plaintiffs was their former employer, Mr. Potts who knew them briefly and had not seen then in years. Mr. Potts' conflicting testimony concerning his knowledge, vel non, of Mr. Washington's workers' compensation claim supports the trial court's credibility choice. Furthermore, no one could testify with any certainty that the "Day 8" tape represented events taking place on June 8, 2000 as opposed to June 7 or 9, 2000.
The law is clear that a determination of whether a videotape is admissible into evidence is largely within the discretion of the trial court. Guillot v. Miller, 580 So.2d 1104, 1106 (La.App. 4 Cir.1991). The determination of the admissibility of videotapes is to be done on a case-by-case basis depending upon the individual facts and circumstances of each case. Id. In general, to prove the content of a photographic representation, the original is required, except as may be otherwise provided by positive law. La.C.E. art. 1002.
Applying these principles, we find that the trial court did not abuse its discretion in refusing to allow the jury to consider the videotape offered by the defense. The trial court's conclusion is supported by the fact that no witness could authenticate any of the several copies of the tape as having been produced at the time of the elevator incident in question. The defendants did not establish a chain of custody proving that the tape could not have been edited or altered between June 8, 2000 and the time of the hearing. Furthermore, the taped image was of such poor quality that those witnesses who were most familiar with the plaintiffs were unable to identify them as the persons portrayed on the tape. The trial court's apparent acceptance of the plaintiff's expert, Mr. Miceli, was not an abuse of discretion. His qualifications and observations were consistent with the evidence and established that the proffered tape lacked authenticity and identification of the plaintiffs. We find no abuse of the trial court's discretion in the judgment refusing to admit the proffered videotape.
Aetna and Corporate argue that this Court, through action on prior writ applications[5] *586 in the litigation, has ruled affirmatively on the authenticity of the tape in question. However, it is clear that our rulings were strictly limited to allowing counsel to use the videotapes in connection with the deposition cross-examination of the plaintiffs' treating physician and only for that limited purpose. There is nothing in the writ dispositions to indicate a finding that the videotapes were authentic or admissible in evidence before the jury.
Schindler and Zurich contend in their second assignment of error that the trial court abused its discretion in excluding the videotape as a discovery sanction absent a discovery order and where the videotape was produced fourteen months before trial. Schindler and Zurich contend alternatively in their third assignment of error that if a discovery sanction was warranted, exclusion of the videotape was unduly harsh and constituted an abuse of the trial court's discretion. Because of our conclusion that the trial court properly excluded the videotape on the grounds of inauthenticity, lack of a chain of custody and failure of identification, these assignments of error are moot.
Schindler and Zurich contend in their fourth assignment of error that the trial court erred as a matter of law in awarding damages for loss of the enjoyment of life and disability and/or disfigurement which were duplicative to the award for past physical and mental pain and suffering.
The trial court gave the following instruction to the jury:
As to plaintiffs' claims, in estimating such damages, you may take into consideration the following elements:
1. Disability and/or disfigurement;
2. Loss of enjoyment of life;
3. Past physical and mental pain and suffering;
4. Future physical and mental pain and suffering;
5. Lost wages;
6. Loss of earning capacity;
7. Medical expenses, past and future.
In Mistich v. Volkswagen of Germany, Inc., 94-0226 (La.App. 4 Cir. 6/25/97), 698 So.2d 47 cited by Schindler and Zurich, a jury awarded plaintiff survivors $150,000 for decedent's pain and suffering during the eight week period between the accident and her death, and separately awarded $600,000 as hedonic damages for loss of enjoyment of life. This court held this to be error, since loss of enjoyment of life, also known as hedonic damages, are included in the concept of pain and suffering. The Mistich opinion cites Foster v. Trafalgar House Oil & Gas, 603 So.2d 284, 285-86 (La.App. 2 Cir.1992). There, the court noted that "hedonic damages" are included in general damages, referring to those damages which may not be fixed with any degree of pecuniary exactitude, but which involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of life-style that cannot be measured definitely in terms of money. The Foster court rejected recognition of hedonic damages as an area of expertise, and refused to allow expert opinions or other evidence quantifying any general damages.[6]
*587 In Brown v. Southern Baptist Hospital, 96-1990, 96-1991, pp. 16-18 (La.App. 4 Cir.3/11/98), 715 So.2d 423, on rehearing clarifying judgment (La.App. 4 Cir.4/15/98), cited by Schindler and Zurich, a jury awarded the plaintiff $125,000 for disfigurement, scarring and loss of enjoyment of life, and additional awards of $250,000 and $175,000, respectively, for past and future suffering, pain and mental anguish. The defendant claimed that the plaintiff was doubly compensated for loss of enjoyment of life and for scarring and disfigurement by his damage awards for past and future pain and suffering. We agreed, holding that an award for loss of enjoyment of life is included in the concept of general damages, and is duplicative of an award for past and future pain and suffering. Likewise, we held that the award for disfigurement and scarring is also duplicative of the award for pain and suffering, since the former has as an integral part of its substance the mental pain and anguish that accompany such disfigurement and scarring.
To the same effect is our earlier opinion in Smith v. Juneau, 95-0724 (La.App. 4 Cir. 4/9/97), 692 So.2d 1365. The jury awarded damages for permanent disability, scarring and permanent disfigurement, and past loss of enjoyment of life totaling $650,000, and damages for past physical pain and suffering, past mental and emotional pain and suffering, and future mental and emotional pain and suffering totaling $450,000. This Court held that the award for permanent disability, scarring and permanent disfigurement, and past loss of enjoyment of life were duplicative of the pain and suffering awards and reduced the judgment by $650,000.
The plaintiffs cite Hanna v. Roussel, 35,346 (La.App. 2 Cir. 12/5/01), 803 So.2d 261 for the contrary position. In that case, the court held that claims for mental anguish or fright are separate and independent from claims for physical pain and suffering. However, that is not the issue in the present case. It is the separation of the various types of general damages that our Court has found impermissible. There is no indication in the Hanna opinion that the trier of fact made such separate awards. The opinion provides, "The court ... awarded Hanna medical expenses of $694.15, property damages of $118.34, lost wages of $96, and general damages in the amount of $6,500." Absent separate awards of hedonic and general damages, the Hanna case is inapposite.
In light of the consistent jurisprudence of this Circuit, we are compelled to delete the award to Mr. Washington for disability and/or disfigurement and loss of enjoyment of life, totaling $400,000.[7]
Schindler and Zurich contend in their fifth assignment of error and Corporate and Aetna contend in their second assignment of error that the jury erred and abused its discretion in awarding excessive general damages in the amount of $219,000 to Travis Parker for a three-month soft tissue injury to his neck and back. Schindler *588 and Zurich contend in their sixth assignment of error and Corporate and Aetna contend in their second assignment of error that the jury erred and abused its discretion in awarding excessive general damages in the amount of $1,654,000 to Edward Washington who underwent four arthroscopic surgeries on his knees and suffered soft tissue injury to his neck and back.
As to the issue of general damages in particular, our initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) cert. den. 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from the jurisprudence is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. It is only when the award is, in either direction beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., supra.
Mr. Washington sustained a ruptured disc and bulging disc in his spinal column, and injuries to both knees. The knee injuries have required four operations, and his physician indicates the likelihood of future knee replacement. Dr. Parnell opined that Mr. Washington is unable to work because of his injuries. The record contains evidence of his severe depression and reliance on pain medication for six to eight years of treatment. While Dr. Parnell testified that some osteoarthritis and chondromalacia pre-existed the accident, the record is clear that these conditions were exacerbated by the trauma caused by Mr. Washington's injury in the elevator.
Mr. Parker sustained less severe injuries, consisting of aggravation of long-standing degenerative changes and abnormalities. He complained of pain in neck and back, and mental trauma caused by the elevator accident. A July 2000 examination revealed tenderness and moderate muscle spasm. He was still experiencing some discomfort and pain, and obtaining medical treatment four months after the accident. He continued chiropractic treatment through June of 2002, two years after the accident. We are unable to say that pain that required two years of medical or chiropractic intervention was of so little consequence that a general damages award of $207,800 would shock the conscience of a reasonable person.
While neither Mr. Washington nor Mr. Parker was an athlete in the prime of young life, each was capable of pursuing their work and their recreation without pain. It is a "black-letter" rule of law that a tortfeasor must take his victim as he finds him, so that these defendants, who do not contend that they were not negligent in this case, are responsible for all the *589 natural and probable consequences of their acts, even though the consequences are made more serious by reason of a pre-existing physical condition, weakness or defect of the injured person.
The awards to Mr. Washington and to Mr. Parker are not obviously the result of passion or prejudice, and they bear a reasonable relationship to the elements of the proved and uncontested special damages. Many rational triers of fact could have decided that a lower award is more appropriate, but we cannot conclude from the entirety of the evidence viewed in the light most favorable to the prevailing party in the trial court, that a rational trier of fact could not have fixed the awards of general damages at the level set by the trial judge or that this is one of those "exceptional cases where such awards are so gross as to be contrary to right reason." Bartholomew v. CNG Producing Co., 832 F.2d 326 (5th Cir.1987); Youn v. Maritime Overseas Corp., supra, 623 So.2d at 1261.
The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience." Moore v. Healthcare Elmwood, Inc., 582 So.2d 871, 879 (La.App. 5th Cir.1991). On the record before us, we cannot say that the awards shock the conscience of a reasonable person.
For the foregoing reasons, we amend the judgment of the trial court to delete the awards to Mr. Washington for loss of enjoyment of life and disability and/or disfigurement totaling $400,000. We affirm the judgment, as amended.
AMENDED AND, AS AMENDED, AFFIRMED.
GORBATY, J., DISSENTS IN PART AND CONCURS IN PART WITH REASONS.
GORBATY, J., dissents in part and concurs in part.
I respectfully dissent. The trial judge's role here was not to resolve conflicting evidence, but rather to decide admissibility. In Barriere Constr. Co., Inc., v. Sys. Contractors, Corp., 99-2869, p. 6 (La.App. 4 Cir. 5/29/96), 764 So.2d 127, 130-131, this court stated, "[T]he test for admissibility is whether or not there are indicia of genuineness sufficient to support a finding that the item in question is what it purports to be." In the instant case, the testimony at trial, particularly from John Baker Potts, II, was sufficient to support the finding that the tape was that which it was purported to be and was probative. Thus, it should have been up to the jury to "ultimately determine ... whether the evidence [was] genuine," according to Cross v. Cutler Biological Div. Of Miles, Inc., 94-1477, p. 11 (La.App. 4 Cir. 5/29/96), 676 So.2d 131, 140. Accordingly, for these reasons, I would reverse the judgment of the trial court and remand this matter for a new trial on liability and damages, allowing the jury to see the videotape in question. Alternatively, I concur in the portion of the majority's opinion reducing the damages awarded.
NOTES
[1] Bellows was the contractor handling the build-out of the Phelps Dunbar law firm's office space.
[2] Ms. Tarleton testified at the hearing that she received the tape from Mr. Peterson on September 19, 2001 and her secretary had the tape copied at Lakeside Camera Shop on September 27, 2001.
[3] The record also contains two set of four tapes each made by Lakeside Camera Shop that together constitute copies of the tape offered by the defense.
[4] Mr. Miceli testified that he was not accusing any of the defendants or their counsel of any wrongdoing, but was suggesting that the improper handling of the evidence may have contaminated it such that this Court should question its authenticity.
[5] 2002-C-1925; 2003-C-0790.
[6] In Laing v. American Honda Motor Co., Inc., 628 So.2d 196 (La.App. 2 Cir.1993), a case tried before the rendition of the Foster opinion, the court allowed expert testimony on enjoyment of life where the jury was instructed that it was free to accept or reject the "expert's" testimony. The opinion notes that the jury did not award the $2,200,000 to which the expert testified, but awarded $1,350,000 for "Laing's loss of enjoyment of life and mental anguish." [Emphasis in the original.] The opinion is silent as to whether the jury considered these as separate elements of damage.
[7] Plaintiffs do not contend that La.C.C.P. art. 1793 bars Schindler and Zurich from making this assignment of error. The record contains the following colloquy:

The Court: Mr. Meyer [counsel for Schindler and Zurich], I think, as well objected to the res ipsa and the loss of enjoyment. And maybe I wasn't clear during the conference yesterday, because y'all looked a bit surprised today. I had kept out the loss of ...
Mr. Milazzo [counsel for Corporate and Aetna]: I may have misunderstood, because looking at my draft from yesterday, I didn't ink it in. Note my objection.
The Court: Fine.